UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,                    Court File No. 19-cr-27 (DWF/LIB) (1)

            Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Marty Keith Larson,

            Defendant.

This matter comes before the undersigned United States Magistrate Judge upon Defendant Marty Keith Larson's ("Defendant") Motion to Suppress Statements, Admissions, and Answers, [Docket No. 23], and Defendant's Motion to Suppress Evidence as a Result of Search and Seizure. [Docket No. 24]. This case has been referred to the undersigned Magistrate Judge for a report and recommendation, in accordance with 28 U.S.C. § 636(b)(1) and Local Rule 72.1. The Court held a motions hearing on April 2, 2019, regarding the parties' pretrial motions.[1]

Following the motions hearing, the parties requested the opportunity to submit supplemental briefing which was completed on May 14, 2019, and Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 23], was then taken under advisement by the undersigned on May 14, 2019.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 23], and Defendant's Motion to Suppress Evidence as a Result of Search and Seizure, [Docket No. 24], both be **DENIED**.

---

[1]The Court addressed the parties' pretrial discovery motions by separate order. [Docket No. 28].

## I.    BACKGROUND[2]

Defendant is charged with five counts of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2251(e); four counts of distribution of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1); one count of receipt of child pornography, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252(b)(1); and one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(4)(B) and 2252(b)(2). (Indictment [Docket No. 9]).

## II.   DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AS A RESULT OF SEARCH AND SEIZURE. [DOCKET NO. 24].

Defendant moves the Court to suppress any physical evidence obtained as a result of the execution on September 25, 2018, of the state court search warrant that authorized officers to search his residence in Keewatin, Minnesota ("Residence").[3]

### A.   Relevant Facts

On September 25, 2018, Officer Albert J. Morse of the Itasca County Sheriff's Department prepared an affidavit ("the Affidavit") in support of an application for a state court warrant to search Defendant's Residence.[4] In the Affidavit, Officer Morse averred as follows:

> On September 23, 2018 and September 24, 2018, Online Covert Employee – 6765 ("OCE"), who is a member of the Federal Bureau of Investigation ("FBI") Child Exploitation Task Force in Salt Lake, City, Utah, was connected to the Internet in an online undercover capacity. OCE had posted numerous online bulletin messages on specific social media forums, which, based on ICE's experience and information gathered from other sources, are websites frequented by individuals who have a sexual interest in children and incest. The bulletin messages were intended to attract individuals with a sexual interest in children. GBI OCE would respond to certain messages or post messages on these public forums and provided OCE's KiK screen name. KiK refers to KiK

---

[2] The Court has set forth the facts that are relevant to each motion in the section addressing each motion.

[3] At the April 2, 2019, motions hearing, Defendant withdrew his Motion to Suppress Evidence with regard to a separate search warrant executed on November 27, 2018. (April 2, 2019, Motions Hearing, Digital Recording at 1:52–1:54 p.m.).

[4] Government's Exhibit 11 is the warrant application, supporting affidavit, and warrant now at issue. At the motions hearing, the Government, without objection, offered the warrant application, supporting affidavit, and warrant now at issue into evidence as Government's Exhibit 11. (April 2, 2019, Motions Hearing, Digital Recording at 1:55–1:56 p.m.).

messenger, a free mobile application that permits users to send text messages and other content, including videos and images.

On September 23, 2018 and September 24, 2018, OCE was a member of a known child pornography group within KiK titled "#FamilyTimesSecret", where members of this KiK group would discuss sexually abusing children and post images and/or videos of child pornography. An individual with the KiK profile name "larsoncountry", using the screen name "Storm Coming", was a member of this group. KiK user "larsoncountry" posted images of child pornography to the group claiming to be of his seven-year-old daughter. FBI OCE sent a message to the KiK group claiming to have a nine-year-old daughter. KiK user "larsoncountry" began communicating with the OCE privately outside of the group within KiK where he discussed sexually abusing his daughter, sent pictures of his daughter (non-nude), sent a close-up view of a prepubescent age girl's vagina (claiming to be his daughter), and requested the OCE to produce child pornography of the OCE's 9-year-old daughter. Highlights of the conversation are as follows (they do not contain the entire conversation):

> [The Court summarizes here the relative information related to the conduct and images that involved a minor child for sharing:[5]
>
> In the conversation between KiK username "larsoncountry" and username "OCE," "larsoncountry" described in length numerous instances of engaging with the minor child in a sexual nature, discussed prior instances where he had sent pornographic images of the minor child with other users besides OCE, inquired whether the conversation would be kept confidential and sent a picture to prove that he was who he said he was, and sent two pornographic images of the minor child, as well as, four non-pornographic images of the minor child.]

(See, Gov't Ex. 11 at 5–7).

Officer Morse then included an explanation of how law enforcement identified KiK

user "larsoncountry":

> The FBI sent an emergency disclosure to KiK requesting subscriber data for KiK user "larsoncountry". The response from KiK identified that KiK user "larsoncountry" listed a subscriber email address of LarsonCountry05@gmail.com. The response from KiK also identified the most recent and consistent IP addresses for the last 30 days as belong to AT&T Mobility and CenturyLink. The IP address(es) for AT&T Mobility could not be traced to a specific cellular telephone. The IP addresses for CenturyLink included 65.102.109.216, 65.102.111.153, and 208.45.124.26.

---

[5] The Court approaches the affidavit in this manner because Defendant submitted the affidavit for a four corners review. The affidavit contains sensitive information related to a minor child, and therefore the Court took this summarizing approach in an effort to safeguard information about the minor child.

The FBI sent an emergency disclosure to CenturyLink requesting subscriber information for IP addresses 65.102.109.216, 65.102.111.153, and 208.45.124.26. All three IP addresses were subscribed to KFC, 1308 Pokegama Avenue South, Grand Rapid, MN 56425.

Database and social media searches identified an Instagram account with user name "larsoncountry05". The Instagram account lists the user's name as "Marty K Larson", having a date of birth of October 21, 1986, and listed an image of an adult male. The Instagram account also listed an image depicting a prepubescent/toddler age girl (non-nude), lying down with a black cat. This image appears identical to the image that KiK user "larsoncountry" sent to OCE during their conversation involving child pornography.

A Minnesota Driver's License search revealed that Marty Keith Larson, date of birth [in] 1986, resides [in] Keewatin, Minnesota 55753. The driver's license image of Larson appears to be the same person as the adult male in the image from the Marty K Larson Instagram account.

Further social media searches revealed that Marty Larson is employed at KFC, which is where the CenturyLink IP addresses logged into KiK user account "larsoncountry" on multiple occasions.

Your affiant conducted a records check through the Itasca County Sheriff's Office records and learned the following:

> Marty Keith Larson DOB [. . .] 1986 and Traci Lynn Lofgren DOB [. . .] 1986 live [at the address now at issue] in the City of Keewatin, MN located in Itasca County.

> Your affiant learned Larson and Lofgren live with 3 children identified as D.D.L. 8y/o male, D.G.L 6 y/o female and G.M.L. 6 y/o male. The three children are believed to be children of Lofgren.

(Gov't Ex. 11 at 7–8) (errors in original).

Officer Morse stated in his affidavit that, based on his training and experience, he was aware that persons who access or manufacture digital media for the purposes of exploitation of children will often times use cellular devices and electronic storage, and other digital media to store or "collect" child pornography.

Officer Morse further stated in his affidavit that based on his experience, he has also learned that collectors and manufacturers of child pornography will oftentimes keep the storage devices (i.e. cell phones, USB drives) on their persons.

On September 25, 2018, the Honorable Richard A. Zimmerman, Itasca County District Court Judge, Ninth Judicial District, State of Minnesota, reviewed and approved Officer Morse's affidavit and application for a state court warrant to search Defendant's Residence in Keewatin, Minnesota. (Gov't Ex. 11).

### B. Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV. The Eighth Circuit has held that "[a]n affidavit establishes probable cause for a warrant if it sets forth sufficient facts to establish that there is a fair probability that contraband or evidence of criminal activity will be found in the particular place to be searched." United States v. Mutschelknaus, 592 F.3d 826, 828 (8th Cir. 2010) (internal quotation marks and citation omitted). "Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" United States v. Colbert, 605 F.3d 573, 576 (8th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 231 (1983)). Courts use a "totality of the circumstances test . . . to determine whether probable cause exists." United States v. Hager, 710 F.3d 830, 836 (8th Cir. 2013) (citation omitted).

The sufficiency of a search warrant affidavit is examined using "common sense and not a hypertechnical approach." United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007) (citation and internal quotations omitted). "In ruling on a motion to suppress, probable cause is determined

based on 'the information before the issuing judicial officer.'" United States v. Smith, 581 F.3d 692, 694 (8th Cir. 2009) (quoting United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986)). "Therefore, '[w]hen the [issuing judge] relied solely upon the supporting affidavit to issue the warrant, only that information which is found in the four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Wiley, No. 09-cr-239 (JRT/FLN), 2009 WL 5033956, at *2 (D. Minn. Dec. 15, 2009) (Tunheim, J.) (quoting United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005); edits in Wiley). In addition, the issuing court's "'determination of probable cause should be paid great deference by reviewing courts,'" Gates, 462 U.S. at 236 (quoting Spinelli v. United States, 393 U.S. 410, 419 (1969)). "[T]he duty of a reviewing court is simply to ensure that the [issuing court] had a 'substantial basis for . . . [concluding]' that probable cause existed." Id. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

### C.  Analysis

In the present case, the Morse Affidavit primarily focuses on law enforcement's undercover conversation with Defendant on the messaging service KiK and the subsequent review of other social media.

Probable cause determinations "d[o] not deal with hard certainties, but with probabilities." Gates, 462 U.S. at 231. "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place. And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause existed." Id. at 238–39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

To establish probable cause for the issuance of a search warrant, "there must be evidence of a nexus between the contraband and the place to be searched before a warrant may properly issue." Tellez, 217 F.3d at 550 (citing United States v. Koelling, 992 F.2d 817, 823 (8th Cir. 1993)). "The requisite nexus between a particular location and contraband is determined by the nature of the crime and the reasonable, logical likelihood of finding useful evidence." United States v. Etheridge, 165 F.3d 655, 657 (8th Cir. 1999) (citing United States v. Christensen, 549 F.2d 53, 57 (8th Cir. 1977)). Additionally, whether probable cause exists to support the issuance of a search warrant depends on the totality of the circumstances: "[i]n determining whether probable cause exists, we do not evaluate each piece of information independently; rather, we consider all of the facts for their cumulative meaning." United States v. Tyler, 238 F.3d 1036, 1038 (8th Cir. 2001).

Based on the information in Officer Morse's affidavit in support of the application for the warrant to search the Defendant's Residence in Keewatin, Minnesota, the Court concludes that Judge Zimmerman had a substantial basis to conclude that probable cause existed to believe that evidence of a crime (i.e., child pornography) could be found at the premises described in Keewatin, Minnesota.

> For probable cause to exist, a magistrate need not determine that the evidence sought is in fact on the premises to be searched, or that the evidence is more likely than not to be found where the search takes place. The magistrate need only conclude that it would be reasonable to seek the evidence in the place indicated in the affidavit.

United States v. Peacock, 761 F.2d 1313, 1315 (9th Cir. 1985) (internal citations omitted) (overruled in part on other grounds).

Officer Morse's affidavit in support of the warrant application refers to Special Agent Tim Ball's (hereinafter "SA Ball") internet investigation, in which he communicated with the KiK username "larsoncountry" on September 23, 2018, and September 24, 2018. During the course of

those communications, username "larsoncountry" sent several pictures depicting what readily appeared to be child pornography.

Based on these communications, law enforcement requested subscriber data for username "larsoncountry" from KiK which identified that username "larsoncountry" was associated with the email address "LarsonCountry05@gmail.com." The response from KiK also identified that KiK username "larsoncountry" had been logging in using three CenturyLink IP addresses, which law enforcement determined belonged to the Kentucky Fried Chicken located at 1308 Pokegama Avenue South, Grand Rapids, MN 56425.

Thereafter, by reviewing other publicly available social media, law enforcement determined that "LarsonCountry05" was associated with an Instagram account belonging to "Marty K Larson," which listed his date of birth in 1986, and that he worked at Kentucky Fried Chicken. The Instagram account also showed an image depicting a toddler-aged child which was also depicted in one of the pictures sent by KiK username "larsoncountry."

Thereafter, law enforcement ran a driver's license search of "Marty K Larson," which showed Marty Larson's address as the Residence in Keewatin, Minnesota, now at issue in the search warrant. Additionally, a search of the Itasca County Sheriff's Office database confirmed Defendant's address as the residence now at issue in Keewatin, Minnesota, and that he had three children, one of which was a female minor child.

Although the IP address identified in Officer Morse's affidavit belonged to Defendant's employer, Kentucky Fried Chicken, this still supports that there was a sufficient basis that evidence of child pornography would be found at Defendant's Residence.

In United States v. Gibson, No. 14-cr-301 (RHK/LIB), 2014 WL 6473436, at *8 (D. Minn. Nov. 18, 2014), for example, the Court held that, where the IP address used to send child

8

pornography belonged to Defendant's employer, the investigator's statement in her affidavit that in her experience and training she learned that the transfer between computers was the preferred method of distributing child pornography, supported that there was a sufficient basis that evidence of child pornography would be found on the computer at the defendant's residence as well.

Likewise, in the present case, while the IP addresses identified in Officer Morse's affidavit belonged to Defendant's employer, Kentucky Fried Chicken, Officer Morse averred that based on his training and experience he has learned that collectors and manufacturers of child pornography will oftentimes use cellular devices and electronic storage to store child pornography and that collectors and manufacturers of child pornography will oftentimes keep the storage devices (i.e. cell phones, USB drives) on their persons. Accordingly, Officer Morse's training and experience supported that there was a sufficient basis that evidence of child pornography would be found at Defendant's Residence. See, e.g., United States v. McArthur, 573 F.3d 608, 613–614 (8th Cir. 2009) (upholding probable cause to search a home computer where defendant found in personal possession of a single hard copy image of computer-modified child pornography, the defendant had multiple previous convictions, and affiant stated that images of child pornography are likely to be hoarded by persons interested in those materials and secreted in secure places like a private residence); See also, United States v. Chrobak, 289 F.3d 1043, 1046 (8th Cir. 2002) (finding a sufficient nexus between the transmission of pornographic files via a defendant's email address and the defendant's home computer in affiant's statement that the email address belonged to the defendant, evidence that the defendant lived at his home address, and a statement that, in her experience, pedophiles maintain their child pornography in a secure place).

The Court's careful review of Officer Morse's affidavit in support of his application for the search warrant indicates that he presented Judge Zimmerman with sufficient specific facts for

the issuing Judge to conclude there was a substantial basis to believe that evidence of the child pornography could be expected to be found at Defendant's home in Keewatin, Minnesota.

## III.   DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS. [DOCKET NO. 23].

Defendant's motion asks the Court to suppress statements that he made to SA Ball and Officer Morse on September 25, 2018, during the execution of a state search warrant.[6]

### A.  Relevant Facts

On September 25, 2018, six members of law enforcement executed a state search warrant at Defendant's Residence. (April 2, 2019, Motions Hearing, Digital Recording at 2:01–2:02 p.m.). The six members of law enforcement arrived in three separate vehicles, one parked in front of the Residence and two parked behind the Residence. (Id.). When law enforcement arrived at Defendant's Residence, Officer Morse and another officer approached the back door of the Residence while SA Ball and the other officers waited in or by their vehicles. (Id. at 2:03–2:04 p.m.). Officer Morse and the other officer knocked on the back door of the Residence and waited to be met. (Id.). Defendant's girlfriend answered the back door and when she opened the door, the officers observed Defendant coming out of the bathroom. (Id. at 2:05–2:06 p.m.). At this time, Officer Morse turned on his recording device. (Id. at 2:06–2:07 p.m.).[7]

Upon seeing Defendant, Officer Morse informed him that he had a search warrant for Defendant's Residence. (Id. at 2:05–2:06 p.m.). At that time, Officer Morse also took custody of Defendant's cellular phone. (Id.).

---

[6] At the April 2, 2019, motions hearing, Defendant clarified that he was only challenging the statements made on September 25, 2018. (April 2, 2019, Motions Hearing, Digital Recording at 1:57–1:58 p.m.).
[7] At the motions hearing, the Government, without objection, offered the recording of Defendant's September 25, 2018, interview into evidence as Government's Exhibit 2. (April 2, 2019, Motions Hearing, Digital Recording at 2:00–2:01 p.m.).

Thereafter, Officer Morse called SA Ball and told him that Defendant was presently at the Residence. (<u>Id.</u> at 2:07–2:08 p.m.). At that point, SA Ball exited his vehicle and entered the Residence from the front door. (<u>Id.</u>). After entering the Residence, SA Ball advised Defendant that he was <u>not</u> in custody and that law enforcement had a search warrant for the electronics in the Residence. (<u>Id.</u>). SA Ball told Defendant twice that he was <u>not</u> under arrest. (Gov't Ex. 2 at 0:30–0:45).

At around the same time as SA Ball initiated contact with Defendant, the other officers conducted a protective sweep of the Residence. (April 2, 2019, Motions Hearing, Digital Recording at 2:09–2:10 p.m.). Defendant was <u>not</u> handcuffed during the course of the protective sweep nor at any point during his encounter with law enforcement. (<u>Id.</u>). Defendant also was <u>not</u> patted down during the course of the protective sweep nor at any point during his encounter with law enforcement. (<u>Id.</u>).

SA Ball and Officer Morse, who were both in civilian attire, began interviewing Defendant in the living room of Defendant's Residence approximately three minutes after SA Ball entered the Residence. (<u>Id.</u> at 2:10–2:11 p.m.). The recording device used to record the interview was sitting out in the open. (<u>Id.</u> at 2:11–2:12 p.m.). During the interview in the living room, SA Ball sat on a couch directly across from another couch where Officer Morse was seated. (<u>Id.</u>). Defendant was seated on a third couch that was approximately five feet to the side of the couches that SA Ball and Officer Morse were seated on. (<u>Id.</u> at 2:12–2:14 p.m.; Gov't Ex. 3). Additionally, based on where he was sitting during the interview, Defendant had unobstructed access to a door to exit the living room. (<u>Id.</u> at 2:13–2:14 p.m.).

At the beginning of the interview, SA Ball reiterated that Defendant was not under arrest, as well as, that the officers would like to talk to Defendant, that Defendant was free to answer

questions and, if at any time Defendant wanted to stop answering questions, he could, and that if Defendant did choose to answer questions, that he needed to tell the truth because it was a violation of federal law to lie to a federal agent. (Id. at 2:15–2:16 p.m.). At no point during the interview did SA Ball or Officer Morse instruct Defendant that his movements around the Residence would be restricted. (Id. at 2:16–2:17 p.m.). Additionally, no other officers besides SA Ball and Officer Morse entered the living room during the course of the interview. (Id.).

SA Ball and Officer Morse maintained a conversational tone during their interview with Defendant. (See, Gov't Ex. 2). Approximately 35 minutes into the interview, SA Ball told Defendant that he did not think he was being truthful with them. (Id. at 35:00–36:00). Although SA Ball indicated to Defendant that he thought he was lying on multiple occasions during the course of the interview, the exchange remained conversational, with Defendant even laughing off the interaction at one point. (Id. at 39:00–39:30). Defendant did express that he was scared about being in trouble at one point during the interview. (Id. at 40:00–40:45). In response, SA Ball attempted to console him and again reiterated that he would not be placed under arrest that day. (Id. at 42:30–43:05).

In total, the interview lasted for one hour and thirty-three minutes. (See, Id.). At no point during the interview or the execution of the search did any law enforcement officer have a weapon drawn. (April 2, 2019, Motions Hearing, Digital Recording at 2:08–2:09 p.m.). Additionally, at no point during the interview did SA Ball or Officer Morse make any promises to Defendant. (Id.). Lastly, at no point during the interview did Defendant ask the officers if he could leave or otherwise indicate that he wanted to end the interview. (Id. at 2:17–2:18 p.m.).

### B.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Law enforcement must provide a Miranda advisory prior to interrogation when a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). Significantly, law enforcement officers "are not required to administer Miranda warnings to everyone whom they question." Oregon v. Mathiason, 429 U.S. 492, 495 (1977). "Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him in custody." Id. (internal quotation omitted).

The Eighth Circuit considers six (6) factors when evaluating whether an individual is "in custody" for the purposes of Miranda:

> (1) Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;  (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning;  (5) whether the atmosphere of the questioning was police dominated; or (6) whether the suspect was placed under arrest at the termination of the questioning.

United States v. Sanchez, 676 F.3d 627, 630 (8th Cir. 2012) (quoting United States v. Griffin, 922 F.2d 1343, 1349 (8th Cir. 1990)). "The first three indicia are mitigating factors which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three

indicia are aggravating factors which, if present, aggravate the existence of custody." United States v. Axsom, 289 F.3d 496, 500-01 (8th Cir. 2002). None of the six factors, however, is entirely dispositive; "[t]he analysis depends upon a review of the totality of circumstances, and '[t]he ultimate test is whether a reasonable person in that position would have felt free to end the interview.'" Sanchez, 676 F.3d at 630-31 (quoting United States v. Aldridge, 664 F.3d 705, 711 (8th Cir. 2011)). Because the ultimate custody determination is based on the totality of the circumstances, a particularly strong showing on one factor may compensate for a deficiency on another factor. Griffin, 922 F.2d at 1347, 1349. The key inquiry is whether there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest. Stansbury, 511 U.S. at 322. "In answering this question, we look at the totality of circumstances while keeping in mind that the determination is based 'on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" United States v. LeBrun, 363 F.3d 715, 720 (8th Cir. 2004) (en banc) (quoting Stansbury, 511 U.S. at 322-23), cert. denied LeBrun v. United States, 543 U.S. 1145 (2005). The Court must examine "both the presence and extent of physical and psychological restraints placed upon the person's liberty during the interrogation in light of whether a reasonable person in the suspect's position would have understood his situation to be one of custody." Axsom, 289 F.3d at 500 (internal quotation marks omitted).

A custodial interrogation is one that "involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda, 384 U.S. at 444. Courts define interrogation as "express questioning or its functional equivalent," which includes "words or action on the part of the police (other than those normally attendant to arrest and custody) that the police should know are

reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 301 (1980).

### C. Analysis

Defendant generally argues that the total environment of the circumstances was tantamount to him being in custody during the interview on September 25, 2018, such that SA Ball and Officer Morse were required to read him the Miranda warnings. Defendant asserts that, as a result, the officers' failure to read him the Miranda warnings requires that the statements that he made during the interview on September 25, 2018, be suppressed.

#### a. Knowledge that encounter was voluntary

The first factor weighs heavily in favor of a finding that the suspect is not in custody when officers clearly inform the suspect that he is free to leave or decline questioning. United States v. Sanchez, 676 F.3d at 630–31 (8th Cir. 2012). Defendant concedes in his Memorandum that before law enforcement questioned him, that SA Ball informed him that he was not under arrest and that if he did choose to answer questions, he could stop answering questions anytime thereafter. (See, Def.'s Mem. in Supp., [Docket No. 36], at 6). Because the officers informed Defendant that he was not under arrest on multiple questions and informed Defendant that he could stop answer questions, this factor weighs heavily against a finding that Defendant was in custody during the September 25, 2018, interview. See, United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006) ("While advising someone that he or she is not under arrest helps to mitigate an interview's custodial nature, an explicit assertion that the person may end the encounter is stronger medicine. Such a statement provides an individual with a clear understanding of his or her rights and generally removes any custodial trappings from the questioning." (citing United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004), cert. denied, 544 U.S. 1060 (2005)).

### b. Restraint on Freedom

Defendant argues that his freedom was restrained because "[i]t is almost certain that although [Defendant] could have sat on the living room couch quietly, he would not have been free to roam through his house, get his belongings, or go about his business." (Def.'s Mem. in Supp., [Docket No. 36], at 7).

As previously discussed, the key inquiry is whether there was a formal arrest or restraining of a defendant's movement to the degree associated with a formal arrest. Stansbury, 511 U.S. at 322. Here, there was no formal arrest nor any physical restraint placed on Defendant to the degree that could be associated to be a formal arrest.

After the officers entered Defendant's Residence, at no point was Defendant placed in handcuffs during the entire time he was interacting with law enforcement. Additionally, when the officers conducted a protective sweep of the Residence, the officers did not even pat down Defendant. Furthermore, during the course of the interview, Defendant sat on a separate couch away from SA Ball and Officer Morse and with unrestricted access to a door to exit the living room. The fact that Defendant was able to terminate the encounter entirely is already accounted for by the first factor. As such, notwithstanding the fact that the officers conducted a protective sweep of Defendant's Residence, nothing in the record presently before the Court suggests a limit on Defendant's liberty amounting to custody or arrest. This second factor does not, therefore, weigh in favor of Defendant being in custody during the September 25, 2018, interview.

### c. Initiated Contact/Voluntary Acquiescence

Law enforcement initiated contact with Defendant when they knocked on the door of his Residence and informed him that they had a search warrant to search his Residence. Defendant was thereafter told that he was not required to answer any questions and if he chose to talk with

16

law enforcement he could cease answering questions at any time. As such, the evidence in the record before the Court indicates that Defendant acquiesced to the encounter with the officers, even if he did not initiate it. Accordingly, the third factor weighs in favor of finding that Defendant was not in custody. See, Axsom, 289 F.3d at 501 (concluding that the third factor mitigated a finding that the defendant had been in custody where he voluntarily acquiesced to police questioning even though he didn't initiate contact with the police).

### d.  Strong Arm or Deceptive Tactics

Defendant argues that SA Ball's informing Defendant of the penalties associated with lying to a federal agent amounted to a strong-arm tactic. (Def.'s Mem. in Supp., [Docket No. 36], at 8). The Court disagrees.

Some strong arm tactics examples can include confronting suspects with false or misleading witness statements, repeatedly lying to the suspect, or employing a good cop-bad cop routine. United States v. Peterson, No. 14-cr-328 (JRT/FLN), 2015 WL 1585507, at *7 (D. Minn. Apr. 2, 2015) (citing United States v. Beraun–Panez, 812 F.2d 578, 580 (9th Cir. 1987)). Other deceptive or strong arm tactics include utilizing persistent and relentless questioning, giving false legal advice to attempt to trick the suspect into confessing to a crime, or manipulating the suspect's insecurities about his or her surroundings. Miranda v. Arizona, 384 U.S. 436, 455 (1966).

In the present case, there is no evidence that the officers used any of the aforementioned strong arm tactics during the September 25, 2018, interview. Rather, the Court's review of the recording of the interview indicates that the officers and Defendant engaged each other in casual, conversational tones without any voices being raised, without any threats being made, nor were any weapons being brandished. While SA Ball did tell Defendant he thought he was lying to him, he did so in a conversational tone. Furthermore, to the extent that Defendant argues that SA Ball

17

telling Defendant that it was against the law to lie to a federal agent, this true statement does not amount to a strong arm tactic. Rather, if anything, SA Ball's warning would have served as a deterrent to Defendant's voluntary acquiescence to the encounter previously discussed because it served as a warning that if Defendant did choose to talk to SA Ball, that he was required to be truthful.

Accordingly, this factor weighs against a finding that Defendant was in custody during the September 25, 2018, interview. See, United States v. Jakel, No. 15-cr-40 (MJD/HB), 2015 WL 4136412, at *10 (D. Minn. July 8, 2015) (no strong arm or deceptive tactics where officers did not make promises or threats or confront the suspect with false or misleading statements).

### e.   Police Dominated Atmosphere

There were some aspects of the encounter at Defendant's Residence that might be described as somewhat police dominated. The three law enforcement vehicles of the officers physically executing the search warrant were parked along the front and back of Defendant's Residence; Officer Morse obtained physical control of Defendant's cell phone early in the encounter;[8] and at least one officer was with Defendant at all times during the September 25, 2018, encounter. Accordingly, this factor weighs slightly in favor of a finding that Defendant was in custody during the September 25, 2018, encounter.

### f.   Arrested At The End of The Encounter

Defendant was not arrested at the end of the encounter and concedes as much in his Memorandum. (See, Def.'s Mem. in Supp., [Docket No. 36], at 9).  As such, this factor weighs

---

[8] The cell phone was seized because it was something specifically described in the search warrant at issue. There is nothing in the record to suggest the cell phone was seized incident to an arrest of Defendant.

squarely against a finding that Defendant was in custody during the September 25, 2018, encounter.

### g. Other Circumstances

The Eighth Circuit has made clear that the above-listed factors are not all of the circumstances that a court may consider when determining whether a suspect is in custody for the purposes of Miranda. See, e.g., Sanchez, 676 F.3d at 630–31. In the present case, the general character of the September 25, 2018, encounter and interview as a whole weighs against a finding that Defendant was in custody during the interview. For most of the hour and a half at issue, Defendant, SA Ball, and Officer Morse sat with Defendant in his living room. See, Axsom, 289 F.3d at 502 ("When a suspect is interrogated in the comfort and familiarity of his home, a court is less likely to find the circumstances custodial."). Also, at no time was Defendant subject to any search of his person. Accordingly, these other circumstances weigh as well in support of a finding that Defendant was not in custody during the interview at issue.

Based on the foregoing, Defendant was not in custody during the encounter and interview at his home on September 25, 2018, and therefore the officers were not required to provide him with the Miranda warnings before questioning him.

Accordingly, the Court recommends denying Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 23], to the extent that Defendant seeks to suppress statements that he made during his encounter with law enforcement officers on September 25, 2018.

IV.     **CONCLUSION**

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY**

**RECOMMENDED** that:

1.   Defendant's Motion to Suppress Evidence as a Result of Search and Seizure, [Docket No.

     24], be **DENIED**, as discussed above; and

2.   Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 23],

     be **DENIED**, as discussed above.

Dated: June 6, 2019                                      s/Leo I. Brisbois
                                                         Leo I. Brisbois
                                                         U.S. MAGISTRATE JUDGE

**N O T I C E**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.